UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SHANNON MCINTIRE,

Plaintiff,

v.

TANA SENN, in her official capacity as Secretary of the Washington State Department of Children, Youth and Families, RUBEN REEVES, in his official capacity as Assistant Secretary of Licensing, LORI MENKEN, in her official capacity as Area Administrator for Licensing,

Defendants.

CASE NO. 3:26-cv-05323-BHS

ORDER

This matter is before the Court on plaintiff Shannon McIntire's motion for preliminary and permanent injunctions, Dkt. 14, and defendants Washington Department of Children, Youth, and Families employees' ("DCYF") motion to dismiss, Dkt. 19.

McIntire applied to be a foster parent in July 2024. In January 2025, after an extensive review process, including home visits and multiple interviews, DCYF denied her application, citing McIntire's unwillingness to affirmatively support a child's sexual

orientation, gender identity and expression ("SOGIE"), including by using a foster child's preferred pronouns as required by Washington Administrative Code ("WAC") 110-148-1520(7) and (9). McIntire requested a religious exemption from the WAC requirements, and DCYF again denied her application in August 2025, citing three grounds: her unwillingness to support and affirm a foster child's SOGIE, her refusal to support and affirm a foster child's religious beliefs, and concerns regarding the condition of her home. DCYF concluded that, if McIntire were granted a religious exemption, placement of a foster child in her home "would cause harm to a child who identified as part of the LGBTQ+ community, or who identified as a member of a religion other than mainstream Christianity." Dkt. 1-2 at 104.

McIntire sued, alleging that WAC 110-148-1520's requirements to support or affirm a child's SOGIE and religious beliefs were facially unconstitutional and unconstitutional as applied to her. She alleged that DCYF's policies required foster applicants to "expressly support a child's sexual orientation and expression, even when it violates the foster parent's religious beliefs," and to "forgo speaking truthfully about her religion when addressing or dealing with inter and intra-faith differences with foster children." Dkt. 13 at 12.

In May 2025, Chief Judge David Estudillo of this district entered a permanent injunction and final judgment in *DeGross v. Hunter*, No. 3:24-cv-05225-DGE, 2026 WL 1408880 (W.D. Wash. May 20, 2026), requiring DCYF to amend WAC 110-148-1520(7), and to remove subsection (9). He ordered that the revised subsection (7) give foster parents the choice to either to connect a child with sources related to the child's

religion and SOGIE or to refrain from impeding DCYF's efforts to connect a child with those resources. *Id.* Judge Estudillo ordered DCYF to refrain from denying a foster parent's application based on an applicant's beliefs regarding SOGIE.

McIntire now moves for injunctive relief, asking the Court to enjoin DCYF from denying her application based on her religious beliefs. Dkt. 14. DCYF moves to dismiss, asserting that in light of the permanent injunction, it no longer denied her application based on her SOGIE-beliefs, but that its two other stated grounds for denying her application—her unwillingness to affirm a foster child's religious beliefs and the condition of her home—provided independent and legally permissible bases for the licensing decision. Dkt. 19.

McIntire responds that her SOGIE-based claims are not moot and that DCYF's second reason for denying her application, her unwillingness to affirm a foster child's religious beliefs, also violates her First Amendment rights. McIntire disputes that the condition of her home was a basis for denial, noting that DCYF had previously attested that it would work with her on that issue. Dkt. 23 at 9.

## I. BACKGROUND

DCYF is responsible for overseeing and administering the Washington state foster care system. *See* RCW 74.15.030. Prospective parents seeking to foster a child must obtain a foster care license from DCYF. *See* WAC 110-148-1300(1). Licensing requirements are "designed to ensure children who are in foster care are safe, healthy and protected from all forms of child abuse and neglect." WAC 110-148-1300(2).

As part of the licensing process, DCYF assesses, among other things, an applicant's ability to comply with licensing requirements, the physical condition of the applicant's home and property, the physical and mental health of household members, and the applicant's financial ability to support the family without foster care reimbursements. WAC 110-148-1370. Foster parents must comply with state and federal nondiscrimination laws and treat foster children "with dignity and respect regardless of actual or perceived race, ethnicity, culture, sex, or SOGIE." WAC 110-148-1520(6).

McIntire applied for a foster care license in July 2024. Dkt. 1-2 at 100. At the time, WAC 110-148-1520(7) required foster parents to connect children with resources that "supports and affirms their needs regarding race, religion, culture, and SOGIE." Subsection (9) required foster parents to support a child's SOGIE by using the child's pronouns and chosen name.

DCYF's home study specialist, Lori Wacker, conducted a home inspection and interview. Dkt. 1-2 at 10. Wacker reported that the condition of McIntire's home was "concerning." *Id.* at 102. Specifically, she reported that McIntire's kitchen was "in a state of disarray," dishes "piled high with crusted dried food remnants," "miscellaneous items cluttering the countertop and dining table," and "dog hair coating the floor and furniture." *Id.* at 102. McIntire told Wacker her limits regarding her ability to care for foster children exploring their sexual identity, gender expression, and faith. *Id.* at 100. She asserted that she would not accompany a child to purchase clothing that would support the child's gender expression. *Id.* She also explained that although she would allow a child to attend gender affirming counseling, she would not attend with the child if the purpose was to

educate her about the topic. *Id.* To "mitigate" DCYF's concerns about McIntire's ability to support a LGBTQ+ foster child, DCYF required McIntire to complete online SOGIE training specific to caregivers, which McIntire completed. *Id.*

DCYF Supervisor Karen Branyan conducted a second scheduled home visit two months later and reported that the home was in "poor condition." Dkt. 1-2 at 102. Branyan observed that the "kitchen was extremely cluttered," there was "excessive pet hair," "little to no space . . . for a child to play, keep their belongings, have floor time or eat a meal at the table," and had an "extremely offensive smell, the source of which was difficult to identify." *Id.* McIntire agreed to rectify the situation and several weeks later, Wacker and Branyan visited the home and reported that it was in "better shape." *Id.*

In November 2024, Wacker and Branyan completed a home visit and follow-up interview. DCYF reported that McIntire would tell a foster child that identifying as LGBTQ+ is "morally wrong" and requires "forgiveness." McIntire disputes DCYF's accounts of her statements, asserting,

> I don't believe that merely identifying as LGBTQ+ is morally wrong or something that requires forgiveness. And I wouldn't initiate a conversation for the purpose of criticizing a child's beliefs or to convince the child that my beliefs are correct. But to the extent that certain actions and behaviors go against my beliefs, I do not want to hide my beliefs from the child or lie to a child who asks me about what my beliefs are. If a child asked me if my religious beliefs were true, which I believe they are, I would not lie to the child.

*Id.* at 29. When DCYF asked McIntire whether she would use a child's preferred pronouns, McIntire answered that she "would try to avoid using pronouns, as this is against biology and grammar," but would use the child's preferred name. *Id.* at 11.

McIntire reported that Branyan asked her, "Why can't you [sic] just tell them that to make them happy?" *Id.* at 20.

In January 2025, DCYF denied McIntire's foster parent application based on concerns that she would not provide affirming and supportive care for LBTQ+ youth. Dkt. 1-2 at 9–16. The Department cited McIntire's general unwillingness to "use a child's preferred pronouns," "accompany a child to purchase clothing that matched their gender identity," "refrain from expressing negative views of a child's gender journey," "attend counseling with the child if [she] felt the purpose was to educate [her],"or "refrain from stating that [her faith] is the correct one," as required by WAC 110-148-1520. *Id.* at 10–11. The Department concluded that McIntire's positions, along with her unwillingness to fully follow a child's case plan, prevented her home from providing a "psychologically and emotionally safe, nurturing, and support[ive] environment for every foster child." *Id.* at 12. DCYF did not mention concerns about the uncleanliness of McIntire's home in its denial.

In April 2025, McIntire requested a religious exemption from "WAC 110-248-1520's requirements that [she] (1) use preferred pronouns that contradict a child's biological sex, 2) refrain from sharing my religious beliefs or sharing my perspective on religious issues, and 3) verbally condone behaviors and ideas that violate my beliefs." *Id.* at 29. McIntire explained,

> My understanding is that the regulations require me to lie to the child about supporting clothing choices I disagree with. Hence, I'm asking for an exemption only to the extent that I am expected to state that I support and/or approve of clothing choices I don't agree with.

* * *

> Similarly, I am willing to attend any training or further education and I am willing to sit in on counseling sessions. But I do not want to participate in any training or attend any counseling session if the goal is for me to change my religious beliefs or to convince me that my religious beliefs are wrong.

* * *

> As I already stated during my interview, I have no problem providing a supportive environment to any child, regardless of how that child identifies. But in case I require a waiver from this WAC, I request a waiver only to the extent that I am required to say or to do things that go against my religious beliefs.

*Id.* at 29. In a follow up questionnaire, McIntire identified specific case plan actions that she would not follow:

> Using incorrect pronouns, verbally supporting dress/behavior intended to communicate a transgender or non-binary identity, attending events like gay pride parades, encouraging a child to socially, medically, or surgically 'transition,' and anything requiring me to categorically hide or avoid exposing a child to my religious beliefs.

*Id.* at 50.

In May 2025, DCYF conducted an unannounced home visit and noted that it had "ongoing concerns regarding the general upkeep and organization of [McIntire's] home." *Id.* at 104. It reported that her home had "little space on the floor to walk comfortably," dishes in the sink with "crusted caked on food remains," and a "kitchen table [that] was not conducive for a child to sit at and have a meal." *Id.* at 104. DCYF concluded that McIntire's home was "not safe and appropriate for infants and young children due to the cluster and disarray," was "not suitable for school-aged children as there [was] not sufficient space to play and complete schoolwork," and was "not suitable for children of

any age" based on the unsuitable conditions of meal preparation and cooking areas. *Id.* at 105.

In August 2025, DCYF denied McIntire's request for an exemption. DCYF cited three primary reasons: (1) McIntire's unwillingness to affirmatively support a child's SOGIE, (2) her refusal to affirm a foster child's religion, and (3) the unkempt conditions of her home. As for the last reason, DCYF relied for the first time on its initial 2024 home visit reports.

On September 23, 2025, McIntire appealed[1] to the Office of Administrative Hearings, contending that she was "discriminated against due to my religious faith and personal political views, neither of which would I force on a child. I am willing to work with the department directly on an improvement plan for their concerns for my home . . . and then have the opportunity to reapply/be reviewed by a different, impartial licensing team." *Id.* at 8.

In April 2026, McIntire sued DCYF, asserting 42 U.S.C. § 1983 claims against them for violations of her First Amendment free exercise and free speech rights. Specifically, McIntire asks that the Court declare WAC 110-148-1520(6), (7), and (8) facially unconstitutional and unconstitutional as applied to her, alleging that DCYF utilized these regulations "to ensure Christians and other faith-based applicants are precluded from the foster care pool." Dkt. 13 at 8. McIntire affirmed that she "would care for children of any faith background" but that she would not "agree to refrain from

[1] This administrative appeal has been stayed pending the outcome of litigation. Reeves Decl., Dkt. 24-2 at 2.

stating her faith is true if asked by a foster child." *Id.* at 14. She alleges that requiring her to do so violates her right to religious free speech. *Id.* at 13. She asks for $1 in nominal relief, punitive damages, and attorneys' fees and costs.

In May 2026, Chief Judge Estudillo entered a final judgment and permanent injunction in *DeGross*, a separate case challenging DCYF's limitations on the foster care licensure of Christian applicants who, based on their religious beliefs, declined to use a child's preferred name and pronouns. He ordered DCYF to revise subsection (7) to "require that foster parents and prospective foster parents be *given the options* to: (a) connect a child with resources and supports in the home and community; *or* (b) refrain from impeding DCYF or other support persons from facilitating their connection to and engagement with resources and supports related to their . . . SOGIE . . . ; or some combination of both (a) and (b)." *Id* at *2 (emphasis added). It also required DCYF to remove the current version of subsection (9) and prohibited DCYF from requiring foster parents "to agree to use prescribed words or language, including chosen pronouns, to express views about sexual orientation, gender identity, or gender expression inconsistent with their sincerely held religious beliefs as a condition of licensure." *Id*.

Two days later, DCYF instructed DCYF licensing staff that they were no longer permitted to deny or restrict a foster care license based solely on an applicant's sincerely held religious beliefs regarding SOGIE. Tacchini Decl., Dkt. 24-2 at 2. DYCF also

initiated the rulemaking process, including by soliciting comments and drafting a proposed rule. Dkt. 24 at 3. The current proposed draft[2] states,

> (g) Provide and arrange for care that is appropriate for children's and youth's age, race, religion, culture, ethnic identity, SOGIE, developmental capabilities, and individual needs and preferences including, but not limited to: . . .
>
> (ii) Connecting them with resources that support and affirm their needs, including emotional and developmental support through their:
>
> (A) Education;
>
> (B) Spiritual activities in the home and community including, but not limited to:
>
> (I) Providing opportunities to participate in their spiritual beliefs and religious or spiritual education; and
>
> (II) Not requiring them to participate in practices against their beliefs; and
>
> (C) Tribal activities within their tribal community or extended tribal family; and
>
> (iii) Supporting their SOGIE by respecting their right to privacy;
>
> (h) If the requirements in (g) of this subsection interfere with foster parents' sincerely held religious beliefs pertaining to marriage, gender, or sexual relationships, they must provide or arrange for care that is appropriate for the children and youth by:
>
> (i) Connecting them with resources and supports in the home and community;
>
> (ii) Refraining from impeding the department, tribes, or other support persons from facilitating their connection to and engagement with resources and supports; or
>
> (iii) A combination of (i) and (ii);

The comments on the current proposed draft are due October 27, 2026.[3]

---

[2] Wash. St. Reg. 26-19-019 (Sept. 4, 2026), https://www.dcyf.wa.gov/sites/default/files/pdf/rules/WSR26-19-019CR102Supp.pdf (last accessed Sept. 29, 2026).

[3] *Submit Rules Comments Online*, WASHINGTON STATE DEPT. OF CHILDREN, YOUTH & FAMILIES, https://dcyf.wa.gov/practice/policy-laws-rules/rule-making/participate/online (last accessed September 29, 2026).

McIntire moves for a preliminary and permanent injunction, arguing that DCYF violated her First Amendment rights by denying her application and asks the Court to enjoin DCYF from denying her application. DCYF moves to dismiss McIntire's claims, emphasizing that her SOGIE-based claims were mooted by *DeGross* and that DCYF's remaining grounds for denial—McIntire's refusal to support a foster child's religion and the unsanitary condition of her home—provide two independent and permissible bases for denying her license. It argues that McIntire could not satisfy WAC 110-148-1440's requirements that her home be "safe and sanitary" or "meet generally accepted health standards for the storage and preparation of food." Dkt. 24 at 5

The issues are discussed in turn.

## II. DISCUSSION

### A. Legal Standard

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6), the Court construes the complaint in the light most favorable to the non-moving party. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). Generally, the Court must accept as true all well-pleaded allegations of material fact and draw all reasonable inferences in favor of the plaintiff. *See Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).

A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction raises the threshold question of whether the Court can adjudicate the claims. A complaint must be dismissed under Rule 12(b)(1) "if, considering the factual allegations in the light most favorable to the plaintiff, the action: (1) does not arise under the Constitution, laws, or

treaties of the United States, or does not fall within one of the other enumerated categories of Article III, Section 2, of the Constitution; (2) is not a case or controversy within the meaning of the Constitution; or (3) is not one described by any jurisdictional statute." *United Transp. Union v. Burlington N. Santa Fe R. Co.*, No. C06-5441 RBL, 2007 WL 26761, at *2 (W.D. Wash. Jan. 2, 2007), *aff'd*, 528 F.3d 674 (9th Cir. 2008).

If the action is moot, it is "no longer a 'Case' or 'Controversy' for purposes of Article III," and the Court lacks jurisdiction. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). A claim is moot if "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* at 91. Although voluntary cessation of allegedly improper conduct does not always make a case moot, the case may nevertheless be moot if the defendant shows that "there is no reasonable expectation that the wrong will be repeated." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632-33 (1953). It is a heavy burden for the party asserting mootness to establish it. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000).

Dismissal under Federal Rule of Civil Procedure 12(b)(6) may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). A plaintiff's complaint must allege facts to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Although the Court must accept as true the complaint's well-pled facts, conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper Rule 12(b)(6) motion to dismiss. *Vasquez v. Los Angeles Cnty*., 487 F.3d 1246, 1249 (9th Cir. 2007); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). This requires a plaintiff to plead "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). The Court's review is "limited to the complaint, materials incorporated into the complaint by reference, and matters of which the Court may take judicial notice." *Metzler Inv. GMBH v. Corinthian Colleges, Inc*., 540 F.3d 1049, 1061 (9th Cir. 2008).

**B. McIntire's SOGIE-based First Amendment claims are moot.**

McIntire claims DCYF violated her First Amendment rights by requiring her to use a child's preferred pronouns and to support a child's behavior surrounding their gender identity and transition. Dkt. 13 at 8; Dkt. 23 at 9. She seeks to enjoin DCYF from further denying her a license for these reasons. Dkt. 14 at 11.

DCYF moves to dismiss McIntire's SOGIE-based First Amendment claims as moot under Rule 12(b)(1). It argues that the permanent injunction in *DeGross* precludes it from denying a foster care license based on an applicant's "religious beliefs regarding SOGIE." Dkt. 19 at 7. It asserts that it has acted swiftly to comply with the *DeGross*

court order, immediately beginning the process of revising WAC 110-148-1520 and preventing further enforcement of that rule. Dkt. 24 at 2–3. It asserts that this Court can provide no additional relief beyond that already prescribed by the permanent injunction. Dkt. 19 at 9.

McIntire argues that her claims are not moot because WAC 110-148-1520(7) and (9) have not yet been formally amended and DCYF has a history of denying foster care licenses to religious applicants. Dkt. 23 at 11. She emphasizes that DCYF has not issued a retraction letter stating that it no longer denies her application based on her SOGIE views. *Id.*

But formal amendment is not required. The *DeGross* injunction prohibits DCYF from denying a license solely based on an applicant's sincerely held religious beliefs regarding SOGIE, and McIntire identifies no basis to conclude that DCYF will disregard that binding order. Indeed, within two days of the order, DCYF instructed all licensing staff of the change, issued internal guidance and practice updates, drafted a proposed rule, and solicited public comment. Reeves Decl., Dkt. 24-2. This is not a case of voluntary cessation; DCYF is bound by a court order, and there is no reasonable expectation that it will resume the challenged licensing practices. *See State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 82 Wn.2d 265, 272 (1973) ("Voluntary cessation of allegedly illegal conduct does not moot a case because there is still a likelihood of the illegal conduct recurring.").

DCYF's motion to dismiss McIntire's SOGIE-based First Amendment claims as moot is **GRANTED** and those claims are dismissed without prejudice and without leave to amend.

**C. McIntire plausibly alleges that DCYF applied WAC 110-148-1520(7) and (8) in such a manner that it violated her First Amendment right to free speech.**

McIntire claims that WAC 110-148-1520(7) and (8),[4] violate her First Amendment right to freedom of speech, both facially and as applied, by restricting her ability to speak about her faith, requiring her to deny what she believes to be true, and compelling her to affirm the truth of religious beliefs other than Christianity. Dkt. 13 at 24.

DCYF moves to dismiss under Rule 12(b)(6), arguing that subsections (7) and (8) do not regulate speech but rather "prescribe conduct for caring for a foster child's religious needs." Dkt. 19 at 11. It asserts that any incidental restriction on a prospective parent's First Amendment freedoms is not greater than is necessary to protect the religious freedoms of children in foster care and to protect those children from discrimination. *Id*. at 12.

Facial and as-applied challenges are distinct claims that present different inquiries and require separate analysis. An as-applied claim contends that the law is

---

[4] Although McIntire claims that subsection (6) also violates her right to freedom of speech, she neither quotes that section nor develops any argument explaining how it violates her rights. She simply asserts that "DCYF has not shown how the language in § 1520(6) related to non-discrimination against SOGIE children will be enforced against a religious adherent." Dkt. 23 at 11. Her concerns about how DCYF might enforce that provision in the future is insufficient to state a claim upon which relief can be granted. DCYF's motion to dismiss as to subsection (6) is **GRANTED** and those claims are dismissed.

unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others. *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998). A facial claim, by contrast, requires a challenger to show that the law violates the Constitution in a much broader set of fact patterns.

**1. McIntire fails to show that WAC 110-148-1520(7) and (8) are facially unconstitutional.**

To succeed on a First Amendment facial challenge, the plaintiff must show that the law "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *Moody v. NetChoice*, LLC, 603 U.S. 707, 724 (2024) (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023)). To make that judgment, a court must examine a regulation's "full set of applications." *Id.* Even a law with "a plainly legitimate sweep" may be struck down if the "law's unconstitutional applications substantially outweigh its constitutional ones." *Id.*

The Court's first step in considering a First Amendment facial challenge is to consider the law's scope, "[w]hat activities, by what actors, do the laws prohibit or otherwise regulate." *Id.*at 724.

Subsections (7) and (8) state:

> (7) You must connect a foster child with resources that *supports and affirms* their needs regarding . . . religion. . . . These resources include emotional and developmental support for . . . spiritual activities in your home and community. . . .
>
> (8) You must *support* a child's religion or spiritual practices by providing adequate opportunities for religious or spiritual training and allowing a child meaningful participation appropriate to the child's spiritual beliefs. You may not require any child to participate in practices against their beliefs.

(Emphasis added). By its terms, these provisions do not regulate an applicant's speech but rather regulate a foster parent's conduct. To "support" and "affirm" a foster child's religious needs, foster parents must "connect" a foster child with resources, "provide" them with adequate opportunities, and "allow" them to meaningfully participate in their religious faith. The regulations are silent as to what a foster parent must say, or not say, to a foster child regarding the child's religion.

Next, the Court must identify which of the law's applications violate the First Amendment as compared to the rest. *Moody*, 603 U.S. at 707.

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Family & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018). Accordingly, a government cannot "restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)). Content-based speech restrictions, comprising discrimination against "particular speech because of the topic discussed or the idea or message expressed," are presumptively unconstitutional and subject to strict scrutiny. *Id.* Viewpoint-based restrictions, based on the "motivating ideology or the opinion or perspective of the speaker," are a particularly "egregious form of content discrimination." *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 829 (1995). A law that suppresses or compels speech based either on content or viewpoint is subject to strict scrutiny. *Bates v. Pakseresht*, 146 F.4th 772, 784 (9th Cir. 2025).

McIntire argues that DCYF applies subsections (7) and (8) in a manner that regulates speech through the regulations' requirements to "support" a child's religion or spiritual practices and "provide 'adequate opportunities for religious or spiritual training.'" Dkt. 23 at 12. Specifically, she contends that DCYF interprets "support" to prohibit foster parents from expressing certain views about a child's religious and spiritual beliefs. McIntire further argues that "DCYF's own practice guide and standardized interview questions systematically screen out applicants with traditional religious views on sex, gender, and interfaith dialogue," resulting in a substantial number of unconstitutional applications. *Id.* at 14. She asserts that these applications are not marginal or hypothetical but rather reflect the intended and routine application of the rule. *Id.*

DCYF argues that McIntire conflates her facial and as-applied challenges by focusing on how DCYF "*applies* the requirement that a foster parent support a child's religion in a discriminatory manner." Dkt. 24 at 7. But a facial First Amendment challenge necessarily requires consideration of a law's application. The relevant question is whether the "law's unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 724.

McIntire fails to make that showing. She acknowledges the plainly constitutional applications of subsections (7) and (8) and maintains that she will support a foster child's religious activities and connect the child with resources consistent with the child's

religious beliefs.[5] She also does not dispute that facilitating a child's religious activities serves the legitimate goal of protecting a foster child's religious freedom and freedom from discrimination. Instead, McIntire contends that the unconstitutional applications of subsections (7) and (8), including DCYF's practice of using interview questions to discriminate against Christian foster applicants, outweighs their constitutional applications. But McIntire identifies no other instance in which DCYF applied the provisions in the manner she alleges. And to prevail on a facial challenge, she must show that the provisions' unconstitutional applications *substantially* outweigh their constitutional ones.

DCYF's motion to dismiss McIntire's First Amendment facial challenge to WAC 110-148-1520(7) and (8) is **GRANTED** and that claim is dismissed.

**2. McIntire plausibly alleges that DCYF applied WAC 110-148-1520(7) and (8) in violation of her free speech rights**

McIntire also claims that the challenged provisions are unconstitutional as applied to her. "A successful as-applied challenge does not render the law itself invalid but only the particular application of the law." *Foti*, 146 F.3d at 635.

McIntire asserts that DCYF applies subsections (7) and (8) to censor a specific category of disfavored speech— the "explanation of her own religious beliefs in conversations with foster children." Dkt. 23 at 16. She contends that this constitutes

[5] McIntire explains, "If I had a child placed in my care who was part of another religion, I would support and happily transport them to/from their regular services in close proximity. If they are part of established youth groups or classes, I would support them with transport as well as any 'at home' work they wanted/needed to do." Dkt. 1-2 at 31.

impermissible content and viewpoint discrimination and cannot survive strict scrutiny. Dkt. 23 at 16. She asserts that expressing her religious beliefs in a hypothetical conversation with a foster child of a different belief system would not harm the child, and that the restrictions are not narrowly tailored because DCYF could instead place children in her home whose religious beliefs are compatible with her own. *Id.* at 16.

In response, DCYF's arguments are inconsistent and contradictory. On the one hand, it argues that subsections (6), (7), and (8) regulate only conduct and do not compel or prohibit speech. Dkt. 19 at 14. But on the other, it asserts that McIntire may discuss her religious beliefs with anyone, including a foster child, "so long as it does not undermine the 'support' for a foster child's religion or spiritual practices as required by Wash. Admin. Code § 110-148-1520(7) and (8) or discriminate against a foster child as prohibited by Wash. Admin. Code § 110-148-1520(6)." *Id.* at 16. That is a restriction on what McIntire may say, not merely on how she may act.

DCYF also points to McIntire's "repeated statements" as support to deny her application:

> When asked how she would respond if a foster child asked questions about religious beliefs, McIntire stated she would tell the foster child her beliefs were inspired by the 'Word of the Lord.' [] While claiming she would respect a foster child's beliefs, McIntire made clear that she would not tell a foster child that a belief system different from her own was okay. [] McIntire told licensors that, if asked, she would tell a foster child that her belief system was the correct one.

*Id.* DCYF cannot have it both ways. It either applies the regulations to restrict a foster parent's speech, or it does not. DCYF's arguments necessarily recognize that it does. DCYF interprets the requirement to "support" and "affirm" a foster child's religious

beliefs as limiting what McIntire may say about her own beliefs. This is a content-based restriction because it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163.

It is also a viewpoint-based restriction. The test for viewpoint discrimination is whether—within the relevant subject category—the government has singled out a subset of messages for disfavor based on the views expressed. *Matal v. Tam*, 582 U.S. 218, 221 (2017). DCYF denied McIntire's foster care application, in part, because:

> If a child asked you if your beliefs were true, you would not lie to the child. You would explain that your religious beliefs come from the Bible, which is the inspired Word of the Lord. . . . You would respect the child's beliefs; however, you would not lie and say that having a belief system different than your own belief is okay.

Dkt. 1-2 at 103. DCYF concluded that response inconsistent with "affirming and supportive care." *Id.* McIntire also alleges that Branyan asked her, "Why can't you [sic] just tell them that to make them happy?" *Id.* at 20. That question illustrates that DCYF was not regulating whether McIntire spoke about religion generally, but what she was required to say about it. As applied to McIntire, WAC 110-148-1520(7) and (8) is content and viewpoint based and subject to strict scrutiny.

To survive strict scrutiny, a state must show that the law "furthers a compelling governmental interest and is narrowly tailored to that interest." *Reed*, 576 U.S. at 171. DCYF argues that the protection of a foster child's religious freedom is a compelling interest. It asserts that this minor restriction on speech is "narrowly tailored to protect foster children while allowing McIntire unbridled freedom to speak in every other context." Dkt. 19 at 16.

McIntire agrees that protecting a child's religious freedom is a compelling interest but argues that DCYF fails to explain how restricting her speech "violates a child's constitutional rights, causes the child harm, or violates §1520 when she states that she will assist any child with living out their own faith." *Id.* at 23.

Viewing the facts in McIntire's favor, the Court concludes that McIntire has plausibly alleged that DCYF unconstitutionally denied her application because she would not refrain from stating her religious beliefs were true. Whether DCYF can ultimately establish that the restriction satisfies strict scrutiny as applied presents a separate question that the Court need not resolve at this stage. This is especially true here, where WAC 110-148-1520 has since been amended to provide foster parents with a choice of whether to connect foster children with resources that support and affirm their needs or refrain from impeding DCYF's efforts in facilitating those resources. *See DeGross*, 2026 WL 1408880, at *2. This amendment likely affects the prospective relief available to McIntire.

At this stage, McIntire need only plausibly allege a First Amendment violation. She has done so here. The Court reaches that conclusion, however, on an inconsistent and insufficiently developed record.[6] The parties previously agreed to stay McIntire's administrative appeal pending this litigation. Although exhaustion of administrative

[6] For example, in DCYF's letter denying McIntire's application, it relied on her alleged statements that "identifying as LGBTQ+ is morally wrong and is something for which a child would need to seek forgiveness," Dkt. 1-2 at 100–01, but then DCYF acknowledged that McIntire does not "believe identifying as LGTBQ+ is morally wrong or requires forgiveness," *id.* at 102–03.

remedies is not required to pursue constitutional claims, the administrative appeal process may provide a more efficient means of developing the record necessary to resolve her as-applied challenge. With the motion to dismiss resolved, the parties should consider lifting the agreed stay and returning to that process before undertaking discovery here. Doing so may clarify the factual basis for DCYF's decision, resolve inconsistencies in the existing record, and narrow the issues ultimately requiring adjudication before this Court.

DCYF's motion to dismiss McIntire's First Amendment free speech claim is **DENIED**.

**D. McIntire plausibly alleges a free exercise violation.**

McIntire also claims that DCYF violated her First Amendment right to free exercise when it denied her application because she "could not support a child's religion or spiritual practices" as required by WAC 110-148-1520(8). Dkt. 1-2 at 103.

DCYF moves to dismiss, asserting that the purpose of the regulation is not to infringe upon the religious practices of foster care applicants but rather to ensure that the religious rights of foster care children are protected. Dkt. 19 at 18. It asserts that the rule is neutral because "regardless of why an applicant cannot support a foster child's religious needs—whether religiously or secularly motivated—the result is the same: failure to satisfy a minimum licensing requirement and issuance of a license denial." *Id.*

McIntire acknowledges that, if a foster child asked her what she believed to be true, she would answer that she believes the Bible and that "her beliefs in God consistent with Christianity are true." Dkt. 14 at 4. But she maintains that "she would respect the beliefs of others if different from hers and she would not refuse care based on differing

beliefs." *Id.* at 4. She asserts that DCYF forced her to "choose between being a licensed foster parent or adhering to her Christian faith." Dkt. 14 at 7. She argues that WAC 110-148-1520(7) and (8) violate the First Amendment, both facially and as applied, by restricting religious expression in her own home. *Id.*; Dkt. 13 at 22.

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. CONST. amend I; *see also Cantwell v. State of Conn.*, 310 U.S. 296, 303 (1940) (holding that the First Amendment's Free Exercise Clause applies to the states through the Fourteenth Amendment). The right to exercise one's religion, however, "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." *Tingley v. Ferguson*, 47 F.4th 1055, 1084 (9th Cir. 2022) (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990)).

Courts apply two levels of scrutiny to laws that burden religious exercise. Laws that are neutral and of general applicability are subject to rational basis review and must be upheld if rationally related to a legitimate government interest. *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1084 (9th Cir. 2015). By contrast, laws burdening religious practice that are not neutral or not of general applicability are subject to strict scrutiny and are constitutional only if narrowly tailored to serve a compelling governmental interest. *Id.*; *see Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). "Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508

U.S. at 531. Courts nevertheless consider each requirement separately, evaluating both the text of the challenged law and its effect in operation. *Stormans*, 794 F.3d at 1076.

A law is neutral if it does not aim to "infringe upon or restrict practices because of their religious motivation," and does not "in a selective manner impose burdens only on conduct motivated by religious belief[.]" *Lukumi*, 508 U.S. at 533, 543. To determine a law's neutrality, the Court begins with its text. A law is facially neutral if its text does not discriminate against religion on its face. *Id.* A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from its language or context. *Id.*

At the time that DYCF considered McIntire's application, WAC 110-148-1520(6), (7), and (8) provided, in relevant part:

> (6) You must follow all state and federal laws regarding nondiscrimination while providing services to children in your care. You must support and engage with foster children in your care with dignity and respect regardless of actual or perceived race, ethnicity, culture, sex, or SOGIE.
>
> (7) You must connect a foster child with resources that *supports and affirms* their needs regarding . . . religion. . . . These resources include emotional and developmental support for . . . spiritual activities in your home and community. . . .
>
> (8) You must *support* a child's religion or spiritual practices by providing adequate opportunities for religious or spiritual training and allowing a child meaningful participation appropriate to the child's spiritual beliefs. You may not require any child to participate in practices against their beliefs.

(Emphasis added). Each of these provisions is facially neutral with respect to a foster care applicant's religion. The primary focus of these provisions is on the religious needs of the foster child, not on the religious needs of the prospective applicants. All applicants, regardless of their religious or secular beliefs, must "connect a foster child with resources

that supports and affirms [the child's] needs regarding . . . religion," provide "adequate opportunities for religious or spiritual training," and allow "meaningful participation appropriate to the child's spiritual beliefs." If an applicant is unable to satisfy those requirements for some reason, secular or religious, their application is denied.

But even if a law is facially neutral, a court must look to the record to determine whether the law operates neutrally in practice. *Stormans*, 844 F. Supp. 2d at 1188 (The Court "'must meticulously survey' how the rule functions in practice in order to eliminate 'religious gerrymanders'—laws tailored to regulate religiously-motivated, but not similar secularly-motivated, conduct.") (citing *Lukumi*, 508 U.S. at 535). A court may determine neutrality by considering "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history." *Lukumi*, 508 U.S. at 543. The court may consider (1) whether the regulation's burden falls, in practical terms, on religious objectors but almost no others; (2) whether the government's interpretation of the law favors secular conduct; and (3) whether the law proscribes more religious conduct than is necessary to achieve its stated ends. *Stormans* 844 F. Supp. 2d at 1188 (citing *Lukumi*, 508 U.S. at 536–38).

Whether the provisions operate neutrally in practice turns on what DCYF means by "support." If "support" requires only facilitating a child's religious exercise, the requirement applies without regard to the applicant's own beliefs. If, however, "support" requires applicants to affirm a child's religious beliefs by stating that the child's beliefs

are true and that their own personal religious beliefs are not, then this requirement operates differently against applicants whose faith precludes such affirmation.[7]

Viewing the evidence in the light most favorable to McIntire, the Court concludes that McIntire has plausibly alleged that WAC 110-148-1520(7) and (8) are not applied neutrally in practice. McIntire asserts:

> If I had a child placed in my care who was part of another religion, I would support and happily transport them to/from their regular services in close proximity. If they are part of established youth groups or classes, I would support them with transport as well as any 'at home' work they wanted/needed to do. . . I also do not want to be forced to say that I approve of or condone a thing I don't agree with.

Dkt. 1-2 at 31. Yet, in denying her application, DCYF focused not on what McIntire would do to support the child's religion, but on what she would say about her own. DCYF asserted that "McIntire made repeated statements demonstrating an intention to refuse to accept religious beliefs other than her own," including her statements that her own beliefs were inspired by the "Word of the Lord" and were true. Dkt. 20 at 2. But McIntire's adherence to her own faith—and her belief in its truth—is itself religious exercise. By relying on those convictions as a basis for denying her application, DCYF burdened her religious exercise. DCYF may require McIntire to support a foster child's religious practices, but McIntire alleges DCYF went further, treating her own religious beliefs and her unwillingness to deny them, as a basis for denying her application.

---

[7] DCYF appears to apply the terms "support" and "affirm" inconsistently with the text of WAC 110-148-1520, which expressly uses those terms in connection with providing access to resources, not requiring particular speech. Dkt. 1-2 at 100, 101, 103, 104.

McIntire plausibly alleges that DCYF applies the provisions in such a way that they infringe upon or restrict religious practices.

For similar reasons, the law operates in a way that is not generally applicable. A law is not generally applicable if it, "in a selective manner[,] impose[s] burdens only on conduct motivated by religious belief." *Id*. at 543. McIntire was denied a license after she voiced religious objections in the way she was required to support and affirm a child's faith. A regulation is not generally applicable when it "imposes a penalty on the free exercise of religion." *Trinity Lutheran*, 582 U.S. at 462.

Regulations that lack neutrality and are not generally applicable are subject to strict scrutiny and are constitutional only if narrowly tailored to serve a compelling governmental interest. *Stormans*, 794 F.3d at 1084. Viewing the evidence in the light most favorable to McIntire, the Court concludes that she has plausibly alleged that DYCF's application of these provisions violate her First Amendment right to free exercise. Whether DCYF can ultimately establish that the provisions, as applied to McIntire, are narrowly tailored to further its compelling interest in protecting a foster child's religious freedom is a separate question that the Court need not resolve at this stage.

Because McIntire has plausibly alleged that DCYF violated her First Amendment right to free exercise by relying on statement of her own religious beliefs in denying her application, DCYF's motion to dismiss this claim is **DENIED**.

**E. Preliminary and Permanent Injunction**

A party seeking a preliminary injunction "must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Likelihood of success on the merits is the most important factor." *Inslee*, 151 F.4th at 1114 (citation modified). The last two factors merge when the government is a party. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). When considering whether to grant this "extraordinary remedy, . . . courts must balance the competing claims of injury and consider the effect of granting or withholding the requested relief, paying particular regard to the public consequences." *Winter*, 555 U.S. at 24.

A preliminary injunction "prohibits a party from taking action" and preserves the *status quo ante litem*, which refers not simply to any situation before the lawsuit was filed, but instead to the "last uncontested status which preceded the pending controversy." *Id*. at 1191.

McIntire argues that DCYF denied her license because she would not refrain from stating that her religious beliefs are true. Dkt. 14. She asks the Court to enjoin DCYF from denying her foster care license and to order it to approve her application.

DCYF responds that even if McIntire can establish her constitutional claims, which it contends she cannot, the condition of her home alone justifies denial of her application.

When reviewing a question regarding an as-applied First Amendment challenge, the factual background is important. But the record in this case is in parts ambiguous, contradictory, and inconsistent as to precisely how McIntire's speech is restrained or burdened and what standard DCYF applied. At this stage, and with the present record, McIntire has failed to meet her burden that she is likely to prevail on the merits. Moreover, in her request for a preliminary injunction, McIntire does not refute DCYF reports that her home was in "poor condition." Instead, in her administrative appeal, McIntire states, "I do not deny that my home needs work, but it is not unsafe for children. . . . I have retained a house cleaner who comes approximately once a month to help clean and organize, and I have worked in the past with a professional organizer, who will be returning to help me again in the near future." Dkt. 1-2 at 54–55. McIntire does not establish a likelihood of success on the merits.

Furthermore, McIntire cannot establish irreparable harm because DCYF identified an independent, nondiscriminatory basis for denying her foster care application. Again, a more developed record through the administrative appeal process could clarify the factual issues and allow DCYF an opportunity to conduct a thorough assessment of her application without relying on WAC regulations that have changed since its initial denial.

The remaining *Winter* factors are evenly balanced.

McIntire's request for a preliminary or permanent injunction requiring DCYF to approve her application is **DENIED**.

## III. ORDER

McIntire has plausibly alleged that DCYF's denial of her foster care application under WAC 110-148-1520(7) and (8) violated her First Amendment rights to freedom of speech and the free exercise of religion. DCYF's motion to dismiss, Dkt. 19, is **GRANTED** in part and **DENIED** in part. McIntire's motion for a preliminary injunction, Dkt. 14, is **DENIED**.

Dated this 29th day of September, 2026.

BENJAMIN H. SETTLE
United States District Judge